# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ALEHEGN MEHARI,<br><br>   Plaintiff,<br><br>  v.<br><br>THE DISTRICT OF COLUMBIA, *ET AL.*,<br><br>   Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)  Civil Case No. 16-1889 (RJL)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## MEMORANDUM OPINION
(March **31**, 2020) [## 44, 45]

Plaintiff Alehegn Mehari ("Mehari" or "plaintiff") brought this action alleging that defendant Metropolitan Police Department ("MPD") officers Candice Wilkes ("Wilkes"), Nico Alfredo Scott ("Scott"), Blake Edward Johnson ("Johnson"), and Bryan Francis Christian ("Christian"), as well as the District of Columbia itself, conspired to violate his constitutional rights, as well as committing several torts against him. Specifically, he alleged various violations of his Fourth, Fifth, and Fourteenth Amendment rights, negligent supervision, malicious prosecution, and abuse of process. After I granted in part and denied in part defendants' Motion for Partial Dismissal or Motion for Partial Summary Judgment, *see* Mem. Op. [Dkt. #21], the remaining parties (Mehari and the officers) proceeded to discovery as to the remaining claims: Fifth Amendment

substantive due process (Count I) and Fourth Amendment false arrest (Count II).[1]  This

matter is now before the Court on the parties' cross motions for summary judgment [Dkt.

## 44, 45].  Upon consideration of the parties' submissions, defendants' motion is

GRANTED in part and DENIED in part.  Plaintiff's motion is DENIED.  The case

against Wilkes as to false arrest, however, will proceed.  All other claims against Wilkes

and all other defendants are dismissed.[2]

## BACKGROUND

Before explaining my reasons for granting defendants summary judgment in part

and denying it in part, a little background is necessary.  Please note, however, that I am

only including those facts that are material to deciding this motion.[3]

After midnight on a Friday in late September 2015, Wilkes was posing as a

prostitute at a Shell gas station on New York Avenue in Northeast Washington, D.C. as

part of an undercover sting operation.  *See* Defs.' Statement of Material Facts ("Defs.'

---

[1] After my prior ruling, Mehari filed an amended complaint naming Wilkes and re-alleging some of the same claims I previously dismissed.  *See* Am. Compl. [Dkt. #25].  As such, I sua sponte dismissed with prejudice claims that previously had been dismissed.  *See* Minute Order of Oct. 16, 2017.  Mehari's claim of an equal protection violation against the officer defendants survived my earlier ruling, but he does not address this claim at summary judgment, so I consider it abandoned and grant summary judgment in favor of the defendants as to equal protection.

[2] This includes any claims previously dismissed against the other officer defendants that were not previously dismissed against Wilkes because she was not named as a defendant until Mehari's amended complaint.

[3] Where facts are disputed, I must draw all justifiable inferences in the plaintiff's favor, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), except where his version of events is "blatantly contradicted by the record, so that no reasonable jury could believe it," *Scott v. Harris*, 550 U.S. 372, 380 (2007).

SOMF") [Dkt. #44-1] ¶ 1.[4] Johnson and Scott were also involved with the operation, tasked respectively with surveilling Wilkes's interaction with suspects and arresting any targets identified by Wilkes. *Id.* ¶¶ 2–3. Christian was supervising the operation from afar and was responsible for approving any arrest paperwork prepared by the arresting officer. *Id.* ¶ 4.

Mehari arrived at the gas station in his taxicab at 2 a.m. and pulled up to one of the pumps on the station's west side. *Id.* ¶ 6. He immediately exited his taxicab and entered the gas station's store. *Id.* ¶ 7. After he entered the store, Wilkes walked around the side of the gas station's store towards the pumps on the station's west side. *Id.* ¶ 8. Meanwhile, Merhari purchased a lottery ticket, exited the store, and returned to his taxicab. *Id.* ¶¶ 7–9. As he approached his taxicab, Mehari looked at Wilkes.[5] *Id.* ¶ 9. Wilkes then walked past the driver's side of the taxicab, around the front of it, and past

---

[4] Although plaintiff filed his own statement of material facts, he did not file an opposition to defendants' statement. Under local rules, he thereby admitted the truth of those allegations. *See* LCvR 7(h)(1) ("In determining a motion for summary judgment, the Court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion."). This local rule tracks the federal rule. *See* Fed. R. Civ. P. 56(e)(2) ("If a party . . . fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion."). Unless one of defendant's facts is squarely disputed by one the assertions in plaintiff's own statement of material facts (or wholly unsupported by the record), therefore, I consider it undisputed for purposes of this motion. When, as here, I have relied on such an undisputed fact, I will cite solely to defendant's statement of material facts.

[5] Defendants say that Mehari "stared" at Wilkes. Defs.' SOMF ¶ 9. To the extent there is a difference between looking and staring, I conclude based on a review of the video that Mehari looked at Wilkes.

the passenger's side before returning to the driver's side. *Id.* at ¶¶ 10–12. While Wilkes

was walking around Mehari's taxicab, he started the car and lowered the driver's side

window. *Id.* ¶ 11. Wilkes stopped walking several feet from Mehari's window and put

away the cell phone on which she had been talking. *Id.* ¶ 13. She and Mehari began

speaking. *Id.* ¶ 16. Seconds later, Mehari's taxicab started moving forward but then

stopped. *Id.* ¶ 14. Seconds after that, the same thing happened again. *Id.* ¶ 15. The two

continued speaking, and, less than two minutes later, Mehari's taxicab moved forward

and then stopped a third time. *Id.* ¶¶ 16–17. The two spoke for another minute, and

Wilkes extended a hand above the taxicab and pointed roughly towards the west. *See id.*

¶¶ 18–19. Mehari then drove off towards the south, and Wilkes signaled for him to be

arrested. *See id.* ¶ 20; Def.'s Mot. for Summ. J. Ex. 6 ("Ex. 6"), Camera 11 2:06:30–36,

Camera 14 2:06:36–50.[6] Police intercepted his taxicab just as it was leaving the gas

station and arrested Mehari. Defs.' SOMF ¶ 21.

All told, the cameras at the gas station captured video images only showing

Mehari and Wilkes speaking for around two and half minutes. *See id.* ¶¶ 16, 18, 19–20;

Ex. 6, Camera 11 2:03:58–06:32. In a subsequent police report, Wilkes recounted their

conversation as follows:

| | |
|---|---|
| Mehari: | You're so pretty |
| Wilkes: | Thanks, you looking for a date |
| Mehari: | I'm just looking |
| Wilkes: | Oh are you sure? You don't want any head or fuck |

---

[6] The defendant provided the Court with video footage from the gas station. *See* Ex. 6.
The gas station's recording system includes nine different cameras, so I refer to both a
camera and a timecode when citing this footage directly. The cameras had no audio
recording capacity.

| Mehari: | I don't know what you are saying. |
| Wilkes: | Do you want me to suck your dick or fuck you? |
| Mehari: | Oh, I have a wife. |
| Wilkes: | So you're going to tell her that I sucked your dick |
| Mehari: | Yes |
| Wilkes: | I didn't know you were married aren't wearing a ring |
| Mehari: | I don't need a ring my love is here (puts hand to heart) |
| Wilkes: | Oh, o.  It's $30.00 for me to suck your dick |
| Mehari: | Ok |
| Wilkes: | So, you got my $30.00 |
| Mehari: | Yes |
| Wilkes: | Ok |

Defs.' Mot. for Summ. J. [Dkt. #44] Ex. 7 ("Police Report") at 1–2. Mehari's account of

the conversation, from his deposition testimony (through a translator), somewhat agrees

with the police report, although it clearly demonstrates that Mehari, for whom English is

*not* his first language, did not understand much of what Wilkes was saying:

A.  She was the one that started speaking.  I don't remember.  Yeah, she was the one that started speaking first.

Q.  And was she speaking in English?

A.  Yes.

Q.  What did – after she said something to you, what did you say to her?

A.  Initially, I told her I don't understand what – you know, what she said.

Q.  And you told her that in English?

A.  Yes. I said I don't understand

Q.  And what did she say in response to that?

A.  So that's when she said do you want a date and I still didn't understand what that was, so I said, "What's that" – you know, "What's that?" So then that's when she said, "Do you want sex" and then she said "date" again.  That's when I told her, "No.  I'm not interested.  I am married."

. . .

Q.  When you told this woman that you were married, what did she say then in response?

A.  And so after I said that, I was about to leave.  Then she looked at my hand and she said that "I don't see a ring on your finger."

Q.  And what, if anything, did you say in response to that?

A.  When she said, I – my response was – I told her that I don't have a ring because the ring is in my heart.

Q. And did she then say anything in response to that?

A. Well, she didn't really give me a response to that but she kept on talking and I kept on saying what is that, I didn't understand.

Q. Okay. And so do you recall – after the comment about your ring being in your heart, do you recall anything else specific either being said by you or by her?

A. She kept on asking do you want dick and she kept on saying that over over again, and I kept on asking her what is that, and she kept on saying do you want dick.

. . .

Q. The report suggests that you said to this – the woman who came to your vehicle, "You're so pretty." Do you recall saying that?

A. I don't – I did not say that. I don't remember saying that.

Q. Okay. The report indicates that you said, "I'm just looking." Did you say that to the woman?

A. I don't remember that.

Q. So you indicate that you don't remember but my question is, did you say it?

A. I did not say that.

Q. The report indicates that the woman said to you, "Oh, are you sure you don't want any head or fuck?" Did she say that to you?

A. Well, yes, she asked something like that, you know, a question something like that, and that's when I told her "no, I'm married."

Q. Okay. All right. Skipping ahead here that the report indicates that the woman said to you, "It's $30.00 for me to suck your dick." Did she say that to you?

A. Yes, she did. I do – I did hear her say $30.00. I – yeah, she said that.

. . .

A. So she was saying that, you know, $30.00 and would you suck, it's $30.00, you know, would I suck and she was saying a lot of things.

Q. Okay. The report indicates in response to that offer from a woman about $30.00 to suck your dick, you said, "Okay." Did you say that?

A. No. I was not saying okay to agree with her. I was – I wanted to leave and I said, okay, okay, and I was leaving.

Q. The report indicates that the woman said to you, "So you got my $30.00?" Did she say that to you?

A. I remember her saying, you know, something about $30.00 but I didn't say anything, you know, to her about that.

Q. Okay. So in response to the question or the statement, "So you got my $30.00," the report indicates that you said, "Yes." Did you say that?

A. I did not say that. I don't remember.

Defs.' Mot. for Summ. J. Ex. 8 ("Mehari Dep.") at 27–37.

Although mentioned *nowhere* in her contemporaneous statement recounted in the police report (nor, for that matter, anywhere in the text of the defendants' motion for summary judgment[7]), Wilkes explains in a declaration filed with the defendants' motion for summary judgment that her pointing over the taxicab may have been done in order to arrange a meeting with Mehari at a nearby hotel:

> While I do not specifically recall what I said to Plaintiff at [the] moment [I pointed in the general direction of the west], it has been my practice in undercover prostitution operations to tell individuals who are soliciting me that (1) I have reserved a room at the hotel located at 1615 New York Avenue NE; and (2) they should meet me at the hotel.

Defs.' Mot. for Summ. J. Ex. 2 ("Wilkes Decl.") ¶¶ 6–7.

Scott arrested Mehari and completed the arrest report. *See* Defs.' Mot. for Summ. J. Ex. 4 ("Scott Interrog. Resp.") ¶¶ 6–7; Arrest Report at 1. Mehari was held in custody for several hours after his arrest. *See* Def. Wilkes's Answer to Pl.'s Am. Compl. ("Wilkes's Answer") [Dkt. #41] ¶ 46. Scott and Johnson signed a Gerstein affidavit in support of Mehari being charged.[8] *See* Defs.' Mot. for Summ. J. Ex. 1 ("Wilkes's Interrog. Resp.") ¶ 21. Thereafter, he had to appear in court on at least four occasions. *See* Defs. Scott, Johnson, and Christian's Answer to Am. Compl. ("Other Defs.'

---

[7] This declaration is mentioned for the first time in defendants' later opposition to plaintiff's motion for summary judgment.

[8] Despite repeated references to this Gerstein affidavit in Mehari's complaint, his motion for summary judgment, and the interrogatories he propounded, there is no copy of this affidavit in the record, nor was the Court able to access the copy ostensibly available on the Superior Court's online case records system. As such, I do not know the contents of this affidavit and cannot rely on those contents in deciding this motion.

Answer") [Dkt. #27] ¶ 50. Mehari refused an offer of probation and a diversion program

and demanded a trial. *Id.* ¶¶ 52–53. But the Government declined to prosecute him on

the day of his trial. *See id.* ¶ 54.

## STANDARD OF REVIEW

Under Rule 56(a) of the Federal Rules of Civil Procedure, this Court should render

summary judgment in favor of defendants unless the pleadings, and any attachments to

the pleadings, establish a "genuine issue as to any material fact." The moving party bears

the initial burden of identifying evidence that demonstrates that there is no genuine issue

of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant

makes that showing, the burden shifts to the non-moving party to "come forward with

specific facts showing that there is a *genuine issue for trial.*" *Matsushita Elec. Indus. Co.*

*v. Zenith Radio*, 475 U.S. 574, 587 (1986). Unless the non-movant can demonstrate a

genuine issue of material fact—which requires him to "cast more than metaphysical

doubt" on the evidence—the movant is entitled to judgment as a matter of law. *Doe v.*

*Gates*, 981 F.2d 1316, 1323 (D.C. Cir. 1993).

## ANALYSIS

**A.    Count I:  Fifth Amendment Substantive Due Process**

Mehari's motion for summary judgment contends that defendants' actions

amounted to a Fifth Amendment violation of due process. As I explained above, I

already dismissed Mehari's procedural due process arguments, so only his substantive

due process arguments remain. Nevertheless, much of Mehari's motion focuses on

procedural due process and attempts to relitigate my earlier ruling. I reject this attempt for the reasons already stated in my earlier opinion. *See* Mem. Op. at 6–8.

As for substantive due process, Mehari cites *Castellano v. Fragozo*, 352 F.3d 939 (5th Cir. 2003) and *Garnett v. Undercover Officer C0039*, 838 F.3d 265 (2d Cir. 2016) to contend that post-arrest false statements and fabrication of evidence by officers effectuated a violation of his right to a fair trial. But there are two problems with this argument. First, unlike in *Castellano* and *Garnett*, Mehari was not actually *tried* for his alleged crime because the Government, correctly in my view, dropped the case against him. Second, although Mehari seems to focus on alleged false statements by Scott and Johnson, nowhere does he explain what false statements these officers allegedly uttered in more than the most generic terms. *See, e.g.*, Pl.'s Mot. for Summ. J. at 9 ("Mehari demonstrates that Defendants Scott and Johnson made false oath(s) to prosecutors and the Superior Court after Mehari rebuffed Wilkes's advances. . . . Defendants . . . filed a false criminal complaint with the United States Attorney's Office."). The allegedly false Gerstein affidavit sworn out by these officers is nowhere to be found in the record of this case. *See* note 6, *supra* p. 7. Thus, Mehari does not set forth particular enough allegations, let alone evidence, to survive summary judgment as to Scott and Johnson. And as he does not even mention Christian, summary judgment is likewise appropriate for him. Mehari does make passing fifth-amendment allegations against Wilkes, but they are based solely on his initial arrest and duplicative of his false arrest claim, so I likewise grant summary judgment to Wilkes on the Fifth Amendment claim.

**B.    Count II:  Fourth Amendment False Arrest**

Mehari next argues that Scott and Johnson, acting on a signal from Wilkes, arrested Mehari without probable cause, in violation of his rights under the Fourth Amendment.  I conclude that Scott and Johnson are entitled to qualified immunity (and therefore summary judgment) based on Wilkes's signal indicating that she had probable cause to arrest Mehari but that Wilkes herself is not entitled to qualified immunity at this stage because, resolving genuine factual disputes in Mehari's favor, it would have been clear to a reasonable officer in Wilkes's position that she did not have probable cause to arrest him.[9]

Officers facing a claim of false arrest under 42 U.S.C. § 1983 are entitled to qualified immunity "unless (1) they violated a federal statutory or constitutional right and (2) the unlawfulness of their conduct was 'clearly established at the time.'"  *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)).  Applying this two-part test here, Wilkes must have (1) called for Mehari's arrest without probable cause (2) in circumstances that made it clear under the law that she lacked probable cause.  Both requirements are satisfied here.

First, on the record before me (and resolving genuine disputes in Mehari's favor), Wilkes has not proven that she had probable cause to call for Mehari's arrest.  The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.

---

[9] Of course, Mehari is not entitled to summary judgment at this stage either.

In the absence of a warrant, an arrest is reasonable if an officer has probable cause to believe that the suspect committed a crime in the officer's presence. *Wesby*, 138 S. Ct. at 586. To determine whether an officer had probable cause for an arrest, I must "examine the events leading up to the arrest, and then decide whether the historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *Id.* (internal quotation marks omitted). Probable cause "is a fluid concept that is not readily, or even usefully, reduced to a neat set of legal rules." *Id.* (internal quotation marks omitted). Rather, "[i]t requires only a *probability* or *substantial chance* of criminal activity, not an actual showing of such activity." *Id.* (internal quotation marks omitted) (emphasis added). As such, it is "not a high bar." *Id.* (internal quotation marks omitted).

Yet the officer here failed to clear even a low bar. To "solicit for prostitution," as Mehari was arrested for doing, means to "invite, entice, offer, persuade, or agree to engage in prostitution or address for the purpose of inviting, enticing, offering, persuading, or agreeing to engage in prostitution." D.C. Code. Ann. §§ 22-2701(a), 22-2701.01(7). "The crime is completed by *agreeing* to engage or offering to engage in sex for money or other material gain." *Nche v. United States*, 526 A.2d 23, 24 (D.C. 1987) (emphasis added). "To establish the offense it is not necessary to prove any particular language or conduct. Ordinarily it is a question of fact whether the acts and words of the defendant, viewed in the light of surrounding circumstances, constituting the inviting or enticing prohibited by the [statute]." *United States v. Smith*, 330 A.2d 759, 761 (D.C. 1975).

Here, based on the undisputed facts and resolving genuine factual disputes in Mehari's favor, Wilkes has failed to prove that an objectively reasonable officer in her shoes would consider it likely, let alone probable, that Mehari committed a crime. Indeed, the totality of the evidence suggests the merest *possibility* of solicitation and nothing more. Reviewing the evidence again, the undisputed,[10] contemporaneous facts weighing in favor of probable cause are:

- Mehari looked at Wilkes as he walked from the store at the gas station to his car[11]
- Mehari lowered his driver's side window
- Mehari said "okay, okay" after Wilkes mentioned the amount $30

The facts weighing against probable cause are:

- Mehari purchased a lottery ticket at the gas station (and so had at least some reason for being at the gas station aside from soliciting)
- Many times throughout their conversation, Mehari either said that he did not understand what Wilkes was saying or asked her questions demonstrating his lack of understanding
- From the video evidence, Wilkes and Mehari spoke for about two and half minutes, which is far longer than it would have taken to have the conversation as Wilkes recounted it in the police report
- Wilkes initiated all talk of sexual activity[12]

---

[10] Most importantly, Mehari disputes that he called Wilkes pretty and that he said "Yes" after she asked if he had her $30, so I do not rely upon these facts in deciding summary judgment.

[11] Defendants describe Wilkes as "provocatively dressed," Defs.' Opp'n to Pl.'s Mot. for Summ. J. 10, but based on my review of the video evidence, I think reasonable minds could differ as to whether Wilkes's attire was "provocative."

[12] It is of course true, as defendants point out, that a defendant need not initiate a conversation to ultimately be guilty of solicitation. *See Thompson v. United States*, 618 A.2d 110, 113 (D.C. 1992) ("[T]his court has affirmed the convictions of individuals who initiated the conversations as well as the convictions of individuals who clearly did not initiate the conversations for which they were arrested."). But the fact that Wilkes initiated not only the conversation but also all talk of sexual activity is still relevant to

- Mehari affirmatively told Wilkes "No. I'm not interested. I am married." when Wilkes asked if he wanted to have sex with her
- Mehari repeated "no, I'm married" when Wilkes asked again if he wanted to have sex or oral sex with her
- By Wilkes's telling, Mehari made the fantastical statement (indicating non-comprehension) that he would tell his wife that Wilkes performed oral sex on him
- Mehari explained that he did not need to wear a wedding ring because his love for his wife was in his heart
- Mehari pulled his car forward, as if to leave, three times during the conversation with Wilkes before any amount of money was mentioned
- Mehari never gave Wilkes any money
- Mehari drove away from the gas station without Wilkes and began pulling onto the street before he was arrested

The obvious communication difficulties, Wilkes's initiation of the conversation and all talk of sexual activity, Mehari's failure to actually pay or even agree to pay any money, Mehari's multiple attempts to drive away during his conversation with Wilkes, the fact that he actually did drive away, and the apparently repeated references by Mehari to his wife and his love for her all combine to prevent me from concluding at summary judgment that a reasonable officer in Wilkes's shoes would have had probable cause.

In a somewhat confusing attempt to salvage their case, the defendants attached a declaration by Officer Wilkes to their motion for summary judgment referencing for the first time the supposed importance of officer Wilkes pointing over Mehari's taxicab towards the west.[13] By Wilkes's telling, it was her regular practice to tell those soliciting

---

determining "whether the acts and words of the defendant, viewed in the light of surrounding circumstances" amounted to a crime. *Smith*, 330 A.2d at 761.

[13] As I noted above, however, defendants referenced this evidence nowhere in their motion for summary judgment. They did reference it several times in response to plaintiff's motion for summary judgment.

her that she had reserved a room at a nearby hotel where she would meet them. This evidence has two problems in the context of this case. First, Wilkes candidly admits that she does not remember actually telling Mehari she would meet him at the hotel; she merely avers that it had been her practice to do so. This general statement, especially when it was made in a declaration not subject to cross-examination, is insufficient for summary judgment. *Cf. Londrigan v. FBI*, 670 F.2d 1164, 1174 (D.C. Cir. 1981) ("[Rule 56(e)'s] requirement of personal knowledge by the affiant is unequivocal and cannot be circumvented. An affidavit based merely on information and belief is unacceptable." (internal quotation marks omitted)). Second, even if Wilkes actually said those words to Mehari, nowhere in the record is it even claimed that he agreed to meet her at the hotel. The defendants note that Mehari drove off after Wilkes pointed in the direction of the hotel, *see* Defs.' Opp'n to Pl.'s Mot. for Summ. J. at 5, but the video reflects that he drove *south* rather than *west* towards the identified hotel.[14] Simply put, leaving the gas station cannot have provided probable cause to arrest Mehari—he had to leave! And the officers arrested him before he could even make good on any theoretical plan to meet at a hotel. Thus, on the record before me, I conclude that the defendants have not shown that Wilkes had probable cause when she called for Mehari's arrest.

Nor is Wilkes entitled to qualified immunity at this stage because the law clearly established that she lacked probable cause to arrest Mehari based on the record before

---

[14] It is true, of course, that Mehari could have circled the block to approach the identified hotel. But he could just as easily have gone in any other direction. At summary judgment, I must draw all justifiable inferences in the *non-movant's* favor.

me. "Clearly established means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *Wesby*, 138 S. Ct. at 589 (internal quotation marks omitted). "This demanding standard protects all but the plainly incompetent or those who knowingly violate the law." *Id.* (internal quotation marks omitted).

Decades of District of Columbia law have made clear that the crime of solicitation requires "proof . . . that the [defendant] offered or agreed to engage in a sexual act in return for a fee." *Ford v. United States*, 533 A.2d 617, 619 (1987) (en banc). Courts repeatedly have overturned convictions either where there was no proof of an offer or agreement that unambiguously related to a sexual act, *see, e.g., Rose v. United States*, 535 A.2d 849, 853 (D.C. 1987), or no proof that monetary or other valuable consideration was part of that offer or agreement, *see Williams v. United States*, 110 F.2d 554, 554 (D.C Cir. 1940); *Graves v. United States*, 515 A.2d 1136, 1144–46 (D.C. 1986); *see also Ford*, 533 A.2d at 625 n.12 (citing *Williams*). Here, both elements were lacking. To be sure, *Wilkes* attempted to satisfy these elements. *She* brought up various sexual acts, *she* mentioned the sum $30, and *she* tried to entice Mehari to accept *her* propositions. But on the record before me, there is no undisputed evidence that Mehari agreed to any of it.

The language in the *Rose* case is particularly on point. There, the D.C. Court of Appeals overturned a solicitation conviction where officers merely observed but did not actually overhear the interactions that led to the defendant's arrest. *See* 535 A.2d at 852. Instead, the conviction rested on the defendant's repeated beckoning to passing motorists,

female attire (on a male defendant), presence in an area known for prostitution, and the time of day. *See id.* Rejecting the sufficiency of this evidence, the court explained:

> The conduct required to establish the offense of [solicitation] invariably includes otherwise innocent behavior; it becomes unlawful only because it betrays an unmistakable intent to invite for [prostitution].[15] Thus, a conviction must rest on the accused's unambiguous manifestation of the intent to engage in [prostitution]. Otherwise, no citizen could hail a cab, wave to a friend, *talk to a stranger*, wait for a date on a street corner, or take an aimless stroll, and shortly return to the scene, without fear of a conviction under § 22-2701.[16]

*Id.* at 853 (emphasis added). What happened here, when factual disputes are resolved and inferences drawn in Mehari's favor, was that he looked at and spoke to a supposedly provocatively-dressed stranger who mentioned sex and money, and then he drove away.

Ultimately, Wilkes's argument for the existence of qualified immunity rests on the word "okay." In Wilkes's view, her offer to perform sexual acts and her setting a price of $30, when combined with Mehari saying "okay" thereafter, gets her close enough to

---

[15] The *Rose* case dealt with a prong of the solicitation statute—soliciting for a lewd or immoral purpose—that was confined to sodomy but was in all other respects identical to soliciting for prostitution. *See Ford*, 533 A.2d at 622 (setting out statute); *Rose* 535 A.2d at 851 n.2 ("Soliciting for a lewd or immoral purpose is limited in the District of Columbia to soliciting for sodomy.").

[16] The Supreme Court's *Wesby* decision is not to the contrary. There, the Court explained that the inquiry is not whether particular conduct is "innocent" or "guilty" but rather the degree of suspicion that attaches to particular types of noncriminal acts. *See* 138 S. Ct. at 588. Certainly, had Mehari engaged in sexual banter, *see, e.g., Moten v. United States*, 81 A.3d 1274, 1280 (D.C. 2013) (defendant's stamen that he was "horny" supporting solicitation conviction), or invited Wilkes into his car, *see, e.g., Wood v. United States*, 498 A.2d 1140, 1142 (D.C. 1985), those potentially-innocent actions would nonetheless have supported probable cause. But here, unlike in *Wesby*, any potentially suspicious conduct could not have been criminal because Wilkes *knew* no crime had occurred at the time she called for Mehari's arrest.

probable cause that she is entitled to qualified immunity. *See* Defs.' Opp'n to Pl.'s Mot. for Summ. J. at 12. Uttering the word "okay" in this context, when Mehari clearly had trouble understanding Wilkes, might have provided qualified immunity had Mehari reached for his wallet, invited Wilkes into his car, or simply remained at the gas station. But that is not what happened here! As Mehari notes in his brief, any suggestion of an agreement between him and Wilkes evaporated when Mehari drove away. *See* Pl.'s Mot. for Summ. J. at 10 (citing *Sornberger v. City of Knoxville*, 434 F.3d 1006, 1016 (7th Cir. 2006).[17] Because Mehari drove away, no reasonable officer in Wilkes's position could have believed she had probable cause to signal for an arrest on the facts before me on summary judgment. As such, I deny summary judgment as to plaintiff's false arrest claim against Wilkes.

As for Scott, Johnson, and Christian,[18] however, I will grant summary judgment because, not being present at the exchange between Mehari and Wilkes, they were entitled to rely on Wilkes's signal. Officers who make an arrest based on another officer's first-hand knowledge "remain entitled to the protections of qualified immunity if

---

[17] Although Mehari cites a Seventh Circuit case, the proposition that an officer's reasonable suspicion or probable cause can be dispelled by subsequent discoveries by the police is clearly established in the District of Columbia. *See, e.g., Ramsey v. United States*, 73 A.3d 138, 142 (D.C. 2013) (explaining that further observation of suspect and surrounding circumstances meant "that what we have assumed was the officer's legitimate suspicion that appellant had committed or was about to commit [a crime] had been dispelled").

[18] Christian was not directly involved in the arrest, so it is unclear what Mehari's theory of false arrest is as to him. Nonetheless, for the sake of completeness, I include him alongside Scott and Johnson.

it was objectively reasonable" to rely on the other officer's word "under the circumstances." *Bolger v. District of Columbia*, 608 F. Supp. 2d 10 (D.D.C. 2009) (citing *Barham v. Salazar*, 556 F.3d 844, 850 (D.C. Cir. 2009)); *see also Barnhardt v. District of Columbia*, 723 F. Supp. 2d 197, 216 (D.D.C. 2010). Here, Wilkes was posing as an undercover prostitute and spoke with Mehari for more than enough time to agree to a future liaison or break off an unsuccessful negotiation. To say the least, the officers did not need to see money exchanged or a sexual act performed in order to reasonably rely on Wilkes's signal. As such, the other defendants are entitled to qualified immunity on Mehari's false arrest claim, so I grant summary judgment in their favor.

## CONCLUSION

For the foregoing reasons, defendants' Motion for Summary Judgment is GRANTED in part and DENIED in part. The motion is DENIED as to Count II against Wilkes. The motion is GRANTED in favor of all other defendants as to Count II and in favor of Wilkes and all other defendants as to all other counts. Plaintiff's Motion for Summary Judgment is DENIED. A separate Order consistent with this decision accompanies this Memorandum Opinion.

RICHARD J. LEON
United States District Judge